## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOEL ROSENFELD, On Behalf of Himself and All Others Similarly Situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **CLASS ACTION COMPLAINT** |
| KINDRED HEALTHCARE, INC., BENJAMIN A. BREIER, PHYLLIS R. YALE, JOEL ACKERMAN, JONATHAN D. BLUM, PAUL J. DIAZ, HEYWARD R. DONIGAN, RICHARD GOODMAN, CHRISTOPHER T. HJELM, FREDERICK J. KLEISNER, SHARAD MANSUKANI, and LYNN SIMON, | ) ) ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

Plaintiff Joel Rosenfeld ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff brings this class action on behalf of the public stockholders of Kindred Healthcare, Inc. ("Kindred" or the "Company") against Kindred and the members of its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. 240.14a-9, and to enjoin the vote on a proposed transaction, pursuant to which Kindred will be acquired by a consortium of three companies: TPG Capital ("TPG"), Welsh, Carson, Anderson & Stowe ("WCAS") and Humana Inc. ("Humana" and together with TPG and WCAS, the "Consortium"),

through Kentucky Hospital Holdings, LLC ("HospitalCo Parent"), Kentucky Homecare Holdings, Inc. ("Parent") and Kentucky Homecare Merger Sub, Inc. ("Merger Sub") (the "Proposed Transaction").

2.      On December 19, 2017, Kindred issued a press release announcing it had entered into an Agreement and Plan of Merger (the "Merger Agreement") with HospitalCo Parent, Parent and Merger Sub.  Under the terms of the Merger Agreement, Kindred stockholders will have the right to receive $9.00 in cash for each share of Kindred common stock they own (the "Merger Consideration").  The Proposed Transaction is valued at approximately $4.1 billion.

3.      On February 5, 2018, Kindred filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy Statement") with the SEC.  The Proxy Statement, which recommends that Kindred stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) Kindred's financial projections, including the financial projections relied upon by Kindred's financial advisors, Barclays Capital Inc. ("Barclays") and Guggenheim Securities, LLC ("Guggenheim"), in their financial analyses; (ii) the background process leading to the Proposed Transaction; (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Barclays and Guggenheim; and (iv) insiders' potential conflicts of interest.  The failure to adequately disclose such material information constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act as Kindred stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction or seek appraisal.

4.      In short, unless remedied, Kindred's public stockholders will be forced to make a voting or appraisal decision on the Proposed Transaction without full disclosure of all material

information concerning the Proposed Transaction being provided to them.  Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

6.    This Court has jurisdiction over the defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Kindred common stock.

9.    Kindred is a Delaware corporation and maintains its principal executive offices at 680 South Fourth Street, Louisville, Kentucky 40202.  Kindred is a healthcare services company that operates a home health, hospice and community care business.  The Company's common stock is traded on the New York Stock Exchange under the ticker symbol "KND."

10.    Defendant Benjamin A. Breier ("Breier") has been President of the Company since May 2012, Chief Executive Officer ("CEO") of the Company since March 2015 and a

director of the Company since 2015.

11.    Defendant Phyllis R. Yale ("Yale") has been Chair of the Board since May 2014 and a director of the Company since January 2010.

12.    Defendant Joel Ackerman ("Ackerman") has been a director of the Company since December 2008.

13.    Defendant Jonathan D. Blum ("Blum") has been a director of the Company since December 2008.

14.    Defendant Paul J. Diaz ("Diaz") has been a director of the Company since May 2002.    Defendant Diaz previously served as Executive Vice Chairman of the Company from March 2015 to March 2016, as CEO from January 2004 to March 2015, as President of the Company from January 2002 to May 2012, and as Chief Operating Officer from January 2002 to December 2003.

15.    Defendant Heyward R. Donigan ("Donigan") has been a director of the Company since March 2014.

16.    Defendant Richard Goodman ("Goodman") has been a director of the Company since March 2014.

17.    Defendant Christopher T. Hjelm ("Hjelm") has been a director of the Company since June 2011.

18.    Defendant Frederick J. Kleisner ("Kleisner") has been a director of the Company since March 2009.

19.    Defendant Sharad Mansukani ("Mansukani") has been a director of the Company since October 2015.

20.    Defendant Lynn Simon ("Simon") has been a director of the Company since

4

November 2016.

21.    The defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants."

**OTHER RELEVANT ENTITIES**

22.    TPG is a global alternative asset firm founded in 1992 with over $73 billion of assets under management.  TPG's investment platforms include private equity, growth venture, real estate, credit and public equity.

23.    WCAS is a private equity firm that focuses its investment activity in the technology and healthcare industries.  Since its founding in 1979, WCAS has organized 16 limited partnerships with total capital of over $22 billion.

24.    Humana is a health and well-being company with its principal executive offices located at 500 West Main Street Louisville, Kentucky 40202.  As of September 30, 2017, Humana had approximately 13.8 million members in its medical benefit plans and approximately 6.9 million members in its specialty products.

25.    HospitalCo Parent is a Delaware limited liability company and is controlled by affiliates of TPG.

26.    Parent is a Delaware corporation and is controlled by affiliates of TPG.

27.    Merger Sub is a Delaware corporation and an indirect wholly owned subsidiary of Parent.

**CLASS ACTION ALLEGATIONS**

28.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own Kindred common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families,

legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

29.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.  The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of January 31, 2018, there were approximately 91,413,775 shares of Kindred common stock outstanding.  All members of the Class may be identified from records maintained by Kindred or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

30.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

31.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in litigation of this nature.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the

management of this action that would preclude its maintenance as a class action.

33.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

34.     Kindred is a healthcare services company that, through its subsidiaries, operates a home health, hospice, and community care business, long-term acute care ("LTAC") hospitals, inpatient rehabilitation facilities ("IRFs"), a contract rehabilitation services business, nursing centers, and assisted living facilities across the United States.  The Company is organized into four operating divisions: the Kindred at Home division, the hospital division, the Kindred Rehabilitation Services division, and the nursing center division.

35.     As of September 30, 2017, Kindred had operations in 2,475 locations in 45 states, including 77 LTAC hospitals, 19 inpatient rehabilitation hospitals, 16 sub-acute units, 609 Kindred at Home home health, hospice and non-medical home care sites of service, 101 inpatient rehabilitation units, and contract rehabilitation service businesses serving 1,653 non-affiliated sites of service.

36.     On November 7, 2016, Kindred announced its strategic decision to exit the skilled nursing facility business as an owner and operator.  As part of this decision, on November 11, 2016, the Company entered into an agreement with Ventas, Inc. ("Ventas") to provide the Company with the option to acquire the real estate for all 36 skilled nursing facilities the Company was then leasing under its master lease agreements with Ventas for an aggregate consideration of $700 million.

37.     On December 1, 2017, Kindred issued a press release providing an update on the divestiture of its skilled nursing facility business.  As of December 1, 2017, the Company had completed the sale of 80 skilled nursing facilities and five assisted living facilities for aggregate proceeds of approximately $658 million.  The Company also announced it reached an agreement with BlueMountain Capital Management, LLC to close five leased facilities in Massachusetts. Defendant Breier commented on the Company's progress to divest this business, stating:

> We have substantially completed the divestiture of our skilled nursing facility business and continue to make steady progress on the sale of a few remaining facilities. We continue to believe that the sale of our skilled nursing facility business will significantly enhance shareholder value, enable us to sharpen our focus on higher margin and faster growing businesses, and further advance our efforts to transform Kindred.

**The Sale Process**

38.     During the spring and summer of 2016, Kindred received inquiries regarding potential strategic transactions from several private equity firms, referred to in the Proxy Statement as "Financial Party A," "Financial Party B," "Financial Party C," and "Financial Party D."

39.     On July 18, 2016, Kindred and Financial Party A entered into a mutual confidentiality agreement, which contained an 18-month standstill provision.  The Proxy Statement fails to disclose whether the confidentiality agreement allows Financial Party A to submit confidential proposals to the Board.

40.     On November 28, 2016, a consortium comprised of Financial Party B and two other private equity firms, referred to in the Proxy Statement as "Financial Party E" and "Financial Party F," submitted a proposal to defendants Breier and Yale to acquire the Company at a price range of $10.50 to $12.00 per share.

41.     From December 13, 2016 through January 3, 2017, Kindred entered into

confidentiality agreements with each of Financial Parties B, C, D, E, F and two additional private equity firms referred to in the Proxy Statement as "Financial Party G" and "Financial Party H" that contained 18-month standstill provisions. The Proxy Statement fails to disclose whether these confidentiality agreements allow Financial Parties B, C, D, E, F, G, and H to submit confidential proposals to the Board.

42.    Humana initiated discussions with Kindred on January 9, 2017 to discuss Kindred's home health and other service offerings and their potential benefit to Humana.

43.    On January 26, 2017, a private equity firm referred to in the Proxy Statement as "Financial Party K" submitted a proposal to acquire the Company for $16.00 per share. Financial Party K's proposal contemplated separating Kindred into two businesses and merging one of those businesses into a health care services company referred to in the Proxy Statement as "Strategic Party 1." Financial Party K subsequently entered into a confidentiality agreement with the Company.

44.    On February 14, 2017, Financial Parties E and F, as a partnership, Financial Party C and Financial Party H each submitted proposals to acquire the Company ranging from $10.00 to $11.00 per share. Financial Party D submitted to representatives of Kindred's financial advisors a proposal for a structured minority investment in Kindred in the form of a convertible preferred instrument that would include a cash coupon with a pay-in-kind election.

45.    On March 1, 2017, Kindred entered into a confidentiality agreement with Strategic Party 1.

46.    On March 7, 2017, Humana submitted a proposal to acquire the Company at a range of $11.00 to $13.00 per share, subject to, among other things, completion of the skilled nursing facility divestiture and consent from Ventas.

47.    In April 2017, Humana requested reaching out to four private equity firms, including Financial Party B, TPG, WCAS, and a private equity firm referred to in the Proxy Statement as "Financial Party I," regarding forming a partnership to facilitate an acquisition of Kindred.

48.    On July 9, 2017, Financial Party E requested permission to engage with a private equity firm referred to in the Proxy Statement as "Financial Party L" to act as a co-investor in a potential acquisition of the Company.  Kindred and Financial Party L entered into a confidentiality agreement on July 18, 2017.  Financial Parties J and F subsequently joined Financial Parties E and L as co-bidders (the "Financial Party E consortium").

49.    On July 27, 2017, Kindred entered into a confidentiality agreement with Financial Party J, which contained a two-year standstill provision.  The Proxy Statement fails to disclose whether this confidentiality agreement allows Financial Party J to submit confidential proposals to the Board.

50.    On August 1, 2017, the Financial Party E consortium submitted a proposal to acquire the Company at a range of $10.00 to $10.50 per share, along with a "highly confident" letter from a major bank providing for a potential debt financing structure.  Also on August 1, 2017, Humana submitted to representatives of Kindred's financial advisors a revised proposal to acquire Kindred in partnership with TPG at a valuation range of $11.00 to $12.00 per share in cash.  The proposal contemplated that Kindred would be separated into two independent businesses at closing with HomecareCo (comprised of the Kindred at Home business) owned 60% by TPG and 40% by Humana, and HospitalCo (comprised of the LTAC and IRF businesses) owned 100% by TPG.

51.    On August 8, 2017, WCAS joined Humana and TPG to form the Consortium.

52.     On August 15, 2017, a private equity firm referred to in the Proxy Statement as "Financial Party M" joined the Financial Party E consortium and entered into a confidentiality agreement, which contained an 18-month standstill provision.  The Proxy Statement fails to disclose whether this confidentiality agreement allows Financial Party M to submit confidential proposals to the Board.  In September 2017, the Financial Party E consortium decided not to continue exploring a potential transaction with the Company.

53.     On October 12, 2017, the Consortium submitted a final proposal to acquire Kindred for $9.00 per share.  Over the next few weeks, Kindred, the Consortium, Ventas and their respective advisors held discussion regarding the potential transaction.

54.     At a November 1 and 2, 2017 Board meeting, senior management of the Company reviewed with the Board the updated Kindred financial model for fiscal years 2017 through 2022.  The revised financial projections included, among other things, a lower 2017 forecast.

55.     Throughout November 2017, the parties and their advisors continued to negotiate the terms of a transaction and merger agreement.

56.     On December 4, 2017, the Financial Party E consortium renewed its interest in the Company and submitted to representatives of Kindred's financial advisors a term sheet for a proposed $650 million preferred stock investment in Kindred, convertible into common stock at a 15-20% premium to market.

57.     At a December 5, 2017 Board meeting, senior management discussed with the Board their updated financial projections for fiscal years 2017 to 2022, which were lower than the financial projections shared with the Board at the November 2 Board meeting.

58.     At a December 15, 2017 Board meeting, senior management discussed with the

Board further revisions they believed should be made to the Company's financial model, thereby lowering the Company's projections once more. The Board then approved these revised financial projections for use by Kindred's financial advisors for purposes of their respective financial analyses and fairness opinions.

59.    On December 18, 2017, Barclays and Guggenheim each rendered their fairness opinions.

60.    The next day, the parties finalized and executed the Merger Agreement.

**The Proposed Transaction**

61.    On December 19, 2017, Kindred issued a press release announcing the Proposed Transaction. The press release stated, in relevant part:

> LOUISVILLE, Ky.--(BUSINESS WIRE)--Dec. 19, 2017-- Kindred Healthcare, Inc. ("Kindred" or "the Company") (NYSE:KND) today announced that its Board of Directors has approved a definitive agreement under which it will be acquired by a consortium of three companies: TPG Capital ("TPG"), Welsh, Carson, Anderson & Stowe ("WCAS") and Humana Inc. ("Humana") (NYSE: HUM) (together, the "consortium") for approximately $4.1 billion in cash including the assumption or repayment of net debt.
>
> Under the terms of the agreement, Kindred stockholders will receive $9.00 in cash for each share of Kindred common stock they hold, representing a premium of approximately 27 percent to Kindred's 90-day volume weighted average price ("VWAP") for the period ending December 15, 2017, the last trading day prior to media reports regarding the potential transaction.
>
> Kindred operates home health, hospice and community care businesses, long-term acute care ("LTAC") hospitals, inpatient rehabilitation facilities ("IRF") and a contract rehabilitation services business. Immediately following the acquisition of Kindred, the home health, hospice and community care businesses will be separated from Kindred and operated as a standalone company owned 40 percent by Humana, with the remaining 60 percent owned by TPG and WCAS ("Kindred at Home"). Humana will have a right to buy the remaining ownership interest in Kindred at Home over time through a put/call arrangement. Kindred's LTAC hospitals, IRFs and contract rehabilitation services businesses will be operated as a separate specialty hospital company owned by TPG and WCAS ("Kindred Healthcare").

Benjamin A. Breier, President and Chief Executive Officer of Kindred, said, "We are pleased to have reached this agreement, which will deliver significant cash value to Kindred's stockholders and concludes a robust strategic review undertaken by the Board and management team over the course of 2017. We believe this agreement maximizes value for stockholders and represents a significant step forward in transforming home healthcare in America by enhancing access to care and reducing costs for people living with chronic conditions. In addition, the specialty hospital company, Kindred Healthcare, will be uniquely positioned to care for the most medically-complex and rehab-intensive populations."

Continued Mr. Breier, "The flexibility and resources gained through the investments by Humana, TPG and WCAS are expected to enhance innovation in both platforms, further our culture of a patient-first approach to high-quality, compassionate care and create new opportunities for Kindred employees."

Bruce D. Broussard, Humana's President and Chief Executive Officer, said, "Humana is focused on enhancing our capabilities for care in the home to prioritize patient wellness while delivering high-quality care in a low-cost setting. This transaction with Kindred underscores the successful and ongoing execution of our strategy by joining with the most geographically diverse home healthcare provider in the country. We are confident that these new capabilities will help Humana continue to modernize home health and meaningfully improve the member and provider experience. We look forward to completing this strategic transaction with TPG and WCAS."

"TPG's healthcare team has a long history of partnering with companies and management teams that hold significant growth potential," said Jeff Rhodes, Partner at TPG. "We believe this transaction will provide Kindred with additional resources and focus to drive significant value for all stakeholders. We look forward to partnering with Humana, WCAS and the management team at Kindred to build on the complementary capabilities this transaction brings together. We are excited to build the new companies and invest behind best in class clinical care."

D. Scott Mackesy, WCAS's Managing Partner, said, "WCAS's healthcare franchise has been built around partnering with excellent management teams and providing incremental resources to drive above market growth. We have a long history of creative dealmaking with corporate partners and look forward to working with Humana, TPG and Kindred's management team to deliver the highest quality, most cost-efficient healthcare to all."

Debra A. Cafaro, Chairman and Chief Executive Officer of Ventas, Inc. ("Ventas") (NYSE: VTR), said, "As the premier capital provider for leading healthcare companies and long-standing partners to Kindred, we are delighted to support Kindred and this transaction. It creates the nation's foremost LTAC, IRF

and contract rehabilitation services operator with improved financial strength. The specialty hospital company, Kindred Healthcare, brings together Kindred's outstanding management team as well as experienced private equity partners with strong healthcare backgrounds. We look forward to deepening our partnership with Kindred's sponsors and building on the strong relationship we have developed with Kindred over many years to continue transforming care for the aging population."

*Leadership and Shared Services*

Upon completing the transaction, Mr. Breier will serve as Chief Executive Officer of the specialty hospital company, Kindred Healthcare. David Causby, currently Executive Vice President and President of Kindred at Home, will serve as Chief Executive Officer of Kindred at Home.

Under a shared services agreement, Kindred Healthcare will continue to provide certain support functions to Kindred at Home for a transitional period.

*Timing and Approvals*

The agreement is subject to certain conditions to closing, including, without limitation, the approval of the agreement by the stockholders of Kindred, the receipt of certain licensure and regulatory approvals, the expiration of the waiting period under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and other customary closing conditions.

The transaction is expected to close during the summer of 2018.

## Insiders' Interests in the Proposed Transaction

62.     Kindred insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and Kindred's public stockholders.

63.     Notably, certain executive officers of Kindred have secured positions with combined company upon completion of the Proposed Transaction.  The Proxy Statement sets forth that "following the closing, Mr. Breier will continue as Chief Executive Officer of Kindred and Mr. Causby will serve as Chief Executive Officer of Parent (which will operate the Homecare Business)."  Proxy Statement at 101.

64.     Kindred insiders stand to reap substantial financial benefits for securing the deal with Campbell.  Each outstanding Company option, whether vested or unvested, and each Company restricted stock unit award and performance stock unit will be converted into cash payments.  The following table sets forth the cash payments the Company's named executed officers stand to receive in connection with their unvested equity awards:

| | Restricted Stock ($) (1) | Unvested PSUs ($) (2) |
|---|---|---|
| *Named Executive Officers* | | |
| Benjamin A. Breier | $ 3,414,609 | $ 2,325,231 |
| Kent H. Wallace | $ 630,000 | $ 419,994 |
| Stephen D. Farber | $ 954,000 | $ 635,994 |
| David A. Causby (3) | $ 719,991 | $ 479,997 |
| Joseph L. Landenwich | $ 419,994 | $ 240,003 |
| *All Other Executive Officers as a Group* (4) (four persons) | $ 1,539,342 | $ 913,113 |

65.     Further, if they are terminated in connection with the Proposed Transaction, Kindred's named executive officers stand to receive substantial cash severance payments in the form of golden parachute compensation, as set forth in the following table:

| Name | Cash ($) (1) | Equity ($) (2) | Perquisites/ Benefits ($) (3) | Pension/ NQDC ($) (4) | Tax Reimbursement ($) (5) | Other (6) | Total ($) (7) |
|---|---|---|---|---|---|---|---|
| Benjamin A. Breier | 13,402,201 | 5,739,840 | 75,900 | — | — | — | 19,217,941 |
| Kent H. Wallace | 5,685,526 | 1,049,994 | 52,100 | — | — | — | 6,787,620 |
| Stephen D. Farber | 5,230,143 | 1,589,994 | 74,400 | — | — | — | 6,894,537 |
| David A. Causby | 4,092,866 | 1,199,988 | 64,800 | — | — | — | 5,357,654 |
| Joseph L. Landenwich | 3,023,810 | 659,997 | 74,200 | — | — | — | 3,758,007 |

## The Proxy Statement Contains Material Misstatements and Omissions

66.     The defendants filed a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Kindred's stockholders.  The Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote their shares in favor of the Proposed Transaction or seek appraisal.

67.     Specifically, as set forth below, the Proxy Statement fails to provide Company

stockholders with material information or provides them with materially misleading information concerning: (i) Kindred's financial projections, including the financial projections relied upon by Kindred's financial advisors, Barclays and Guggenheim; (ii) the background process leading to the Proposed Transaction; (iii) the data and inputs underlying the financial valuation analyses that support the fairness opinions provided by Barclays and Guggenheim; and (iv) insiders' potential conflicts of interest.  Accordingly, Kindred stockholders are being asked to make a voting or appraisal decision in connection with the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Kindred's Financial Projections***

68.     The Proxy Statement is materially deficient because it fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

69.     Throughout the process leading up to the announcement of the Proposed Transaction, Kindred's management created sets of financial projections, which purportedly exhibited management's expectations regarding Kindred's future financial performance.

70.     The Proxy Statement discloses a partial summary set of projections created on December 15, 2017 – three days before Barclays and Guggenheim delivered their fairness opinions (the "December 15 Projections") for years 2018 through 2022.

71.     The Proxy Statement fails to disclose, however, any information whatsoever about any previous sets of projections that the Company's management created.

72.     The Proxy Statement specifically references financial projections that management previously revised and presented to the Board on November 1 and 2, 2017 (the "November 2 Projections"):

> On November 1 and 2, 2017, the Board met in person with representatives of senior management for a regularly scheduled meeting. . . . Representatives of

senior management reviewed with the Board the updated Kindred financial model for the fiscal years 2017 through 2022, which were circulated to the Board prior to the meeting. Representatives of senior management discussed with the Board the key drivers and assumptions of and the rationale for the revised financial projections, which included, among other things, accounting for an updated lower 2017 forecast, the insurance restructuring and reduced expectations for Kindred's post-acute benefits management strategy in later years.

Proxy Statement at 59.

73.     The Proxy Statement further discloses that management then further revised its projections and presented an updated lower set of projections to the Board on December 5, 2017 (the "December 5 Projections"):

[R]epresentatives of senior management discussed with the Board their updated lower financial projections for the fiscal years 2017 to 2022, including the key drivers and assumptions of, and rationale for the changes to the financial projections shared with the Board at the November 2 meeting. These changes included updates to reflect third quarter actual results, refined assumptions with respect to the insurance restructuring and LTAC hospital closings.

*Id.* at 63.

74.     Ten days later, management again revised its projections, creating the presumably lower December 15 Projections, which the Board then authorized Kindred management to share with Barclays and Guggenheim for purposes of their respective financial analyses and fairness opinions:

On December 15, 2017, the Board met in person with representatives of senior management for a regularly scheduled meeting at which they discussed, among other things, Kindred's financial model. . . . Senior management had determined that two revisions should be made to the financial model in order to provide the Board with senior management's best estimate of Kindred's future performance. *The first change built a contingency into the financial model beginning in the fiscal year 2019 to reflect Kindred's historical and ongoing inability to meet its operational budget targets and the risks facing Kindred, particularly on the reimbursement front. **The second change deleted cash flows** related to Kindred's possible expansion into the post-acute benefits management space, a line of business Kindred was still developing and thus was viewed as speculative.* Following discussion, the Board approved the revised financial projections proposed by senior management and authorized senior management to share these

17

projections with Kindred's financial advisors for purposes of their respective financial analyses and fairness opinions.

*Id.* at 65-65.  Emphasis added.

75.     The timing of management's downward revisions to its projections is concerning.  During this period, the U.S. was in the process of enacting tax reforms that would drastically lower the corporate tax rate:

On November 2, 2017 and November 9, 2017, respectively, the House Ways and Means Committee and the Senate Committee on Finance each introduced tax reform legislation under the Tax Cuts and Jobs Act, which we refer to as the "Tax Bill". The proposed Tax Bill would, among other things, lower the federal corporate tax rate from 35% to 20%, limit the deduction for net interest expense, place a cap on the utilization of net operating losses arising after December 31, 2017 at 80% of taxable income and eliminate the ability to carryback net operating losses.

*Id.* at 60.  The proposed tax reform legislation ("Tax Bill") was passed in the U.S. House of Representatives on November 16, 2017 and an amended version of the Tax Bill passed in the U.S. Senate on December 2, 2017.  *See id.* at 61-62.

76.     In fact, the Proxy Statement acknowledges that on December 17, 2017 – two days after finalizing the December 15 Projections – "the Board met telephonically with representatives of senior management, Barclays, Guggenheim Securities and Cleary Gottlieb to discuss status updates and the latest Tax Bill and its potential impact on Kindred."  *Id.* at 65.

77.     The Proxy Statement further sets forth that, in connection with their financial analyses, in addition to the December 15 Projections, the Board instructed its financial advisors to utilize projections updated to take into account the potential impact of the Tax Bill (the "Tax Rate Adjustment Projections") and subsequent changes to Medicare (the "Tax Rate Adjustment and Medicare Adjustment Projections").  For example, with respect to Barclays' analyses, the Proxy Statement sets forth:

> At the instruction of Kindred, in addition to the financial analyses Barclays performed in connection with rendering its opinion, Barclays performed certain illustrative sensitivity analyses relating to certain potential changes to federal corporate tax rates and limitations on the deductibility of interest expenses, as well as reductions in Medicare reimbursement rates for illustrative purposes only. At the direction of Kindred, the sensitivity analyses reflected the Kindred projections as adjusted to reflect a 21% federal corporate tax rate, interest deduction capped at 30% of EBITDA through 2021 and at 30% of EBIT thereafter, non-deductible interested carried forward and a hypothetical 1% reduction in Medicare reimbursement rates to reflect the possibility, per Kindred management, that Medicare spending by the U.S. government might be reduced in order to offset all or a portion of any lost revenue arising from tax reform, incremental to any rate cuts or increases reflected in the Kindred projections, beginning in 2021 (the "Kindred tax sensitivity projections").

Proxy Statement at 81-82.  With respect to Guggenheim's analyses, the Proxy Statement similarly sets forth:

> In the course of performing its reviews and analyses for rendering its opinion, Guggenheim . . . reviewed certain non-public business and financial information regarding Kindred's business and prospects, all as prepared and provided to Guggenheim Securities by Kindred's senior management and including (i) certain financial projections for Kindred for the years ended December 31, 2017 through December 31, 2022, (ii) certain illustrative adjustments to the Kindred projections made by Kindred's senior management to reflect the potential impact of expected U.S. federal tax reform as provided in the Tax Bill and (iii) certain further illustrative adjustments to the Kindred projections as to the potential negative impact on Medicare reimbursement arising from the Tax Bill . . .

> * * *

> Guggenheim Securities assumed that the Kindred projections, the illustrative adjustments to the Kindred projections for the illustrative potential impact of the Tax Bill on Kindred and the illustrative potential negative impact on Kindred of changes to Medicare reimbursement arising from the Tax Bill, such other estimates and such other forward-looking information had been reviewed by the Board with the understanding that such information would be used and relied upon by Guggenheim Securities in connection with rendering its opinion . . . .

*Id.* at 85-86.  Yet, although Barclays and Guggenheim both performed discounted cash flow analyses using Kindred management's Tax Rate Adjustment Projections and Tax Rate Adjustment and Medicare Adjustment Projections, the Proxy Statement fails to disclose either

the Tax Rate Adjustment Projections or Tax Rate Adjustment and Medicare Adjustment Projections.

78.     The discounted cash flow analysis is widely recognized as the most probative of a company's intrinsic value, and manipulating financial projections can yield highly misleading valuation ranges in a discounted cash flow analysis.  Barclays' and Guggenheim's discounted cash flow analyses using the Tax Rate Adjustment Projections resulted in per share valuations of Kindred significantly above the $9.00 per share Merger Consideration.  Indeed, Guggenheim's discounted cash flow analysis using the Tax Rate Adjustment Projections resulted in a per share value of $18.21 at the high end of the range and $12.97 at the midpoint - a $7.87 per share increase compared to its discounted cash flow analyses using the December 15 Projections.

79.     Following the December 22, 2017 signing of a revised version of the Tax Bill into law, the Tax Rate Adjusted Projections are the best estimates of Kindred's future performance.  Without these tax-reform adjusted projections and the previous sets of projections leading to the December 15 Projections (the basis for the tax reform-adjusted projections),[1] Kindred stockholders cannot assess the revisions to the Company's projections and whether the revisions were proper or were engineered to depress the future financial outlook of the Company to make the Merger Consideration appear more favorable following the enactment of the Tax Bill into law.

80.     In addition, in conjunction with management's financial model, management created a 95% and 90% sensitivity analyses.  The Proxy Statement sets forth that the December

---

[1] Although the Proxy Statement fails to disclose when management first created the Tax Rate Adjustment Projections and Tax Rate Adjustment and Medicare Adjustment Projections, and when the respective sets of projections were first provided to the Company's financial advisors, Plaintiff infers that the Tax Rate Adjustment Projections and Tax Rate Adjustment and Medicare Adjustment Projections are based on the December 15 Projections.

15 Projections the Board authorized management to provide to the Company's financial advisors

is a 95% sensitivity analysis of management's financial model:

> Senior management then discussed the Kindred financial model and the "95%" and "90%" sensitivity analyses that had been previously shared with the Board and noted that the Kindred financial model represented an aspirational or "upside" case, while the 90% sensitivity analysis reflected a "downside" case. Senior management noted that, based both on historical performance and senior management's expectations, the "95%" sensitivity analysis would be expected to be closest to Kindred's future performance.

*Id.* at 65.   Yet, the Proxy Statement fails to disclose any of management's unsensitized

projections as well as management's second sensitivity scenario, assuming Kindred achieved

90% of the revenue and EBITDAR projections.

81.    The Proxy Statement further sets forth that in connection with its financial

analyses, Barclays reviewed and analyzed Kindred management's net operating loss ("NOL")

projections for the years 2017 through 2022.  *See* Proxy at 73.  The Proxy Statement fails to

disclose the NOL Projections.

82.    Moreover, the Proxy Statement omits material information with respect to the

December 15 Projections and the financial analyses performed by Barclays and Guggenheim.

The Proxy Statement sets forth:

> Barclays performed a discounted cash flow analysis of Kindred based on estimates of unlevered free cash flows of Kindred based upon the Kindred projections to derive a range of implied present values per share of Kindred common stock. Barclays derived a range of implied enterprise values for Kindred by adding the present values of (i) estimates of after-tax unlevered free cash flows of Kindred for the three months ending December 31, 2017 and each of the fiscal years 2018 through 2022, calculated based upon the Kindred projections and guidance from Kindred management and (ii) a range of terminal values for Kindred derived by applying perpetuity growth rates ranging from 1.75% to 2.25% to the estimated terminal unlevered free cash flow for Kindred calculated based upon the Kindred projections and assuming depreciation equaled capital expenditures, each calculated utilizing discount rates ranging from 8.50% to 9.50%, reflecting estimates of the cost of capital for Kindred and derived by application of the Capital Asset Pricing Model. The after-tax unlevered free cash

flows were calculated by taking the tax-affected earnings before interest, tax expense and amortization, with such amount treating stock-based compensation as a cash expense, adding depreciation, and subtracting capital expenditures, changes in working capital, noncontrolling interest distributions and certain other projected net cash outflows, per Kindred management.

Proxy Statement at 76.  The Proxy Statement further sets forth that "Guggenheim Securities performed illustrative stand-alone discounted cash flow analyses of Kindred based on projected after-tax unlevered free cash flows for Kindred and an estimate of its terminal/continuing value at the end of the projection horizon, based on the Kindred projections." *Id.* at 90.  However, the Proxy Statement fails to disclose the Company's unlevered free cash flows for the three months ended December 31, 2017 and each of the fiscal years ended 2018 through 2022 and further fails to disclose the line items utilized to calculate the Company's unlevered free cash flows.

83.    The omission of this information renders the statements in the "Certain Unaudited Prospective Financial Information" and "Opinion of Kindred's Financial Advisors" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning the Background Process of the Proposed Transaction***

84.    In addition, the Proxy Statement omits material information relating to the sale process leading up to the Proposed Transaction.

85.    Critically, the Proxy Statement fails to expressly indicate whether the confidentiality agreements including 18-month or two-year standstill provisions that Kindred entered into with prospective bidders, excluding Humana, TPG and WCAS, are still in effect and/or contain "don't ask, don't waive" ("DADW") standstill provisions that are presently precluding each and every one of these prospective bidders from making a topping bid for the Company.  Critically, although the Proxy Statement expressly indicates that certain of these

standstill provisions permitted the parties to submit confidential proposals, the Proxy Statement does not indicate that the standstill provisions in the confidentiality agreements Kindred entered into with each of Financial Parties A, B, C, D, E, F, G, H, J and M permit the respective parties to submit confidential proposals.

86.     The disclosure of the terms of the standstill provisions in the confidentiality agreements Kindred entered into with potential buyers is crucial to Kindred stockholders being fully informed of whether their fiduciaries have put in place restrictive devices to foreclose a topping bid for the Company.

87.     The omission of this information renders the statements in the "Background of the Merger" section of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

*Material Omissions Concerning Barclays' and Guggenheim's Financial Analyses*

88.     The Proxy Statement describes Barclays' and Guggenheim's fairness opinions and the various valuation analyses performed in support of their opinions.  However, the description of Barclays' and Guggenheim's fairness opinions and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, Kindred's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Barclays' and Guggenheim's fairness opinions in determining whether to vote their shares in favor of the Proposed Transaction or seek appraisal. This omitted information, if disclosed, would significantly alter the total mix of information available to Kindred's stockholders.

89.     With respect to Barclays' *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the after-tax unlevered free cash flows of Kindred for the three months

ending December 31, 2017 and each of the fiscal years of 2018 through 2022 cash flows utilized by Barclays in the analysis, as well as the underlying inputs; (ii) Barclays' basis for selecting perpetuity growth rates of 1.75% to 2.25%; (iii) the implied terminal multiples resulting from the analysis; (iv) Kindred's net debt utilized in the analysis; (v) the NOL Projections and estimated present value of the NOL carryforwards of Kindred utilized based on the NOL Projections; and (vi) the inputs and assumptions underlying the discount rates ranging from 8.5% to 9.5% that Barclays applied to Kindred's NOL carryforwards.

90.    With respect to Barclays' *Comparable Company Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Barclays in the analysis as well as the estimated present value of the NOL carryforwards of Kindred utilized by Barclays in this analysis.

91.    With respect to Barclays' *Illustrative Potential Separation Costs* analysis, the Proxy Statement fails to disclose each of: (i) the estimated fees and expenses related to issuing new debt financing; (ii) the taxes on gains in excess of Kindred's NOLs arising from a separation of the Kindred at Home business, based on data from Kindred management; and (iii) the certain other one-time transaction costs, utilized by Barclays in this analysis.

92.    With respect to Barclays' *Illustrative Future Share Price Analysis*, the Proxy Statement fails to disclose: (i) Kindred management's projected rent expense for fiscal years 2019, 2020, and 2021; (ii) Kindred management's projected amount of Kindred's net debt and the book value of noncontrolling interests as of September 30, 2018, 2019, and 2020, respectively; (iii) the estimated NOL carryforwards as of September 30, 2018, 2019, and 2020, utilized by Barclays in this analysis; and (iv) the inputs and assumptions underlying the discount rate of 10.0% and, with respect to the NOLs, 9.0%, utilized by Barclays in this analysis.

93.    With respect to Barclays' *Illustrative Discounted Cash Flow Sensitivity Analysis*, the Proxy Statement fails to disclose: (i) the after-tax unlevered free cash flows of Kindred for the three months ending December 31, 2017 and each of the fiscal years of 2018 through 2022 utilized by Barclays in this analysis, including the projections referred to in the Proxy Statement as the "Kindred tax sensitivity projections" reflecting no reduction in Medicare reimbursement rates (the Tax Rate Adjustment Projections) and the projections reflecting a 1% reduction in Medicare reimbursement rates (the Tax Rate Adjustment and Medicare Adjustment Projections), as well as the underlying inputs; and (ii) the inputs and assumptions underlying the discount rates ranging from 9.0% to 9.5% utilized by Barclays in this analysis.

94.    With respect to Barclays' *Illustrative Future Share Price Sensitivity Analysis*, the Proxy Statement fails to disclose: (i) Kindred management's projected rent expense for fiscal years 2019, 2020, and 2021 utilized by Barclays in this analysis; (ii) Kindred management's projected amount of Kindred's net debt and the book value of noncontrolling interests as of September 30, 2018, 2019, and 2020, respectively, utilized by Barclays in this analysis; (iii) the estimated NOL carryforwards as of September 30, 2018, 2019, and 2020, utilized by Barclays in this analysis; and (iv) the inputs and assumptions underlying the discount rate of 10.5% and, with respect to the NOLs, 9.25%, utilized by Barclays in this analysis.

95.    With respect to Guggenheim's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the Company's projected after-tax unlevered free cash flows for years 2018 through 2022 and the terminal year, as well as the underlying inputs; (ii) the inputs and assumptions underlying the discount rate range of 8.00% to 9.25%; (iii) Guggenheim's basis for selecting perpetuity growth rates of 1.75% to 2.25%; and (iv) the implied terminal multiples resulting from the analysis.

96.     With respect to Guggenheim's *Illustrative Discounted Cash Flow Analyses (Tax Bill Cases)*, the Proxy Statement fails to disclose: (i) the Company's projected after-tax unlevered free cash flows for years 2018 through 2022 and the terminal year, for each of the Tax Rate Adjustment Projections and the Tax Rate Adjustment and Medicare Adjustment Projections, as well as the underlying inputs; (ii) the inputs and assumptions underlying the discount rate range of 8.25% to 9.50%; (iii) Guggenheim's basis for selecting perpetuity growth rates of 1.75% to 2.25%; and (iv) the implied terminal multiples resulting from the analysis.

97.     When a banker's endorsement of the fairness of a transaction is touted to stockholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

98.     The omission of this information renders the statements in the "Certain Unaudited Prospective Financial Information" and "Opinion of Kindred's Financial Advisors" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

***Material Omissions Concerning Company Insiders' Potential Conflicts of Interest***

99.     Further, the Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Kindred insiders.

100.    The Proxy Statement sets forth that "following the closing, Mr. Breier will continue as Chief Executive Officer of Kindred and Mr. Causby will serve as Chief Executive

26

Officer of Parent (which will operate the Homecare Business)."  Proxy Statement at 101. However, the Proxy Statement fails to disclose whether any of the Consortium's prior proposals or indications of interest mentioned management retention.  Notably, although the Proxy Statement indicates that the confidentiality agreements Kindred entered into with Humana, WCAS and TPG prohibited the parties from engaging in "*discussions* with Kindred management regarding the *terms* of their post-transaction employment or equity participation without Kindred's consent" (Proxy Statement at 45, 51, 52) (emphasis added), the confidentiality agreements apparently did not preclude the parties from communicating their intent to retain certain members of management.

101.    Communications regarding post-transaction employment and merger-related benefits during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

102.    The omission of this information renders the statements in the "Background of the Merger" and "Interests of Kindred's Executive Officers and Directors in the Merger" sections of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act.

103.    The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy Statement.  Absent disclosure of the foregoing material information prior to the stockholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make

a fully-informed decision whether to vote in favor of the Proposed Transaction or seek appraisal and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## COUNT I

### Class Claims Against All Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

104.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

105.    During the relevant period, defendants disseminated the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

106.    By virtue of their positions within the Company, the defendants were aware of this information and of their duty to disclose this information in the Proxy Statement.  The Proxy Statement was prepared, reviewed, and/or disseminated by the defendants.  It misrepresented and/or omitted material facts, including material information about the sales process for the Company, the financial analyses performed by the Company's financial advisor, and the actual intrinsic standalone value of the Company.  The defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

107.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction or seek appraisal.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

108.    By reason of the foregoing, defendants violated Section 14(a) of the Exchange

Act and SEC Rule 14a-9 promulgated thereunder.

109.    Because of the false and misleading statements in the Proxy Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure defendants' misconduct is corrected.

## COUNT II

### Class Claims Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

110.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

111.    The Individual Defendants acted as controlling persons of Kindred within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Kindred and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

112.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

113.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy Statement at issue contains the unanimous

29

recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of the Proxy Statement.

114. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

115. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

116. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' conduct, Kindred's stockholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of Kindred, and against defendants, as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until defendants disclose and disseminate

the material information identified above to Kindred stockholders;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the Exchange Act, as well as SEC Rule 14a-9 promulgated thereunder;

E.    Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: February 15, 2018

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
Daniel P. Murray (#5785)
901 N. Market St., Suite 1000
Wilmington, DE 19801
Tel.: (302) 778-4000
Email: rernst@oelegal.com
          dmurray@oelegal.com

**WEISSLAW LLP**
Richard A. Acocelli
Michael A. Rogovin
Kelly C. Keenan
1500 Broadway, 16th Floor
New York, New York 10036
Tel: (212) 682-3025
Fax: (212) 682-3010

*Attorneys for Plaintiff*
